1  KATHY BAZOIAN PHELPS (155564)
2  kphelps@diamondmccarthy.com
   **DIAMOND McCARTHY LLP**
3  1999 Avenue of the Stars, Suite 1100
   Los Angeles, CA 90067
4  Telephone: (310) 651-2997
5
   CHRISTOPHER D. SULLIVAN (148083)
6  csullivan@diamondmccarthy.com
7  **DIAMOND McCARTHY LLP**
   150 California Street, Suite 2200
8  San Francisco, CA  94111
9  Telephone: (415) 692-5200

10 Attorneys for Robert P. Mosier
   Permanent Receiver
11
                    **UNITED STATES DISTRICT COURT**
12
                    **CENTRAL DISTRICT OF CALIFORNIA**
13
                         **SOUTHERN DIVISION**
14

| | |
|---|---|
| 15 ROBERT P. MOSIER, solely in his capacity | Case No.: |
| 16 as Permanent Receiver in the matter of Securities and Exchange Commission vs. | |
| 17 Capital Cove Bancorp LLC and Christopher M. Lee aka Rashid K. Khalfani, *U.S. Dist.* | **COMPLAINT:** |
| 18 *Court, Central Dist. of CA, Case No.:* *CV15-00980-JLS (JCx)* | **(1) FOR AVOIDANCE AND RECOVERY OF** |
| 19 | **FRAUDULENT TRANSFERS – LIEN TRANSFERS --** |
| 20          Plaintiff,                v. | **PURSUANT TO CAL. CIV. CODE §§ 3439.04(a), 3439.05, 3439.08(b);** |
| 21 CREATIVE ASSET MANAGEMENT, | |
| 22 LLC, a California limited liability company; DAN W. BAER, an individual; | **(2) FOR AVOIDANCE AND RECOVERY OF** |
| 23 HAMILTON COVE REALTY, INC., a corporation; DENNIS WESLEY, an | **FRAUDULENT TRANSFERS – CASH TRANSFERS --** |
| 24 individual; JOANNE WESLEY, an | **PURSUANT TO CAL. CIV.** |
| 25 individual; COMPASS ALTERNATIVE INVESTMENTS, LLC, a California limited | **CODE §§ 3439.04(a), 3439.08(b)** |
| 26 liability company, | |
| 27 | |
| 28          Defendants. | |

-1-
COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

1    Robert P. Mosier, the duly appointed Permanent Receiver (the "Receiver" or
2  "Plaintiff") for Capital Cove Bancorp LLC and its affiliates and subsidiaries
3  (collectively referred to as "Capital Cove"), for his complaint against Defendants
4  named herein, alleges:

5                              **INTRODUCTION**

6    This lawsuit arises from a fraudulent Ponzi scheme run by Capital Cove and
7  its former Managing Director and CEO, Rashid Khalfani ("Khalfani").  Pursuant to
8  the scheme, over $14 million was solicited from investors who believed they were
9  investing in a real estate investment program.  Capital Cove and Khalfani represented
10 that the returns would be generated from the purchase of distressed properties and the
11 subsequent refurbishment and sale of those properties at a profit. Investors were
12 made a variety of promises including, but not limited to, returns of up to 30% on
13 their principal investments, first or second trust deeds to secure their investment, and
14 an interest in a fund that itself would hold a senior trust deed in property. In all, no
15 fewer than 69 investors invested money in one of the Capital Cove "investments."

16    In fact, fewer than 5 investors appear to actually have received a first trust
17 deed, many others who were promised first trust deeds received junior trust deeds,
18 and many other investors others who were promised security in real property did not
19 receive any security whatsoever.

20    Capital Cove did in fact purchase and purport to refurbish and sell some
21 properties, all of which served to add an air of legitimacy to the investment program.
22 However, Capital Cove's operation was unable to generate profits from the
23 refurbishment and sale of properties that would have been sufficient to generate the
24 returns promised to investors. Rather, the funds necessary to purchase, refurbish and
25 maintain the properties, and to pay promised returns to investors, were obtained from
26 new dollars placed into the scheme by new or existing investors.

27    Capital Cove required money to run its Ponzi scheme, much of which was paid
28 into the scheme by investors. Hard money lenders also were used to purchase some

-2-                          COMPLAINT FOR AVOIDANCE AND
                             RECOVERY OF FRAUDULENT TRANSFER

1   of the properties that were the basis for the investment scheme. The Defendants
2   named herein are some of the lenders who repeatedly lent money to Capital Cove
3   which, along with the investors' funds, was used to purchase properties.  The
4   Defendants lent money to Capital Cove on at least 8 occasions over the course of
5   about 4 years. The Defendants charged very high non-default and default interest
6   rates to Capital Cove, along with late charges and other fees, profiting handsomely
7   from the relationship with Capital Cove while enabling and assisting the Ponzi
8   scheme to perpetuate itself.

9       This Complaint seeks to: (1) avoid the liens on properties which became part
10  of the receivership estate on June 18, 2015, or which are attached to the proceeds of
11  sales of those properties; (2) avoid the liens on properties belonging to Capital Cove
12  that were acquired and then sold prior to June 18, 2015; and (3) avoid payments of
13  interest, return of principal, late charges and other fees that have been paid to
14  Defendants in connection with the 8 loans that have been identified by the Receiver.

15                    **PARTIES, JURISDICTION AND VENUE**

16      1.     Robert P. Mosier is the duly appointed Permanent Receiver for Capital
17  Cove Bancorp LLC and its subsidiaries and affiliates, including but not limited to:
18  Capital Cove International, Inc., Capital Cove Asset Management, Inc., Capital
19  Cove Financial, Capital Cove Asset Management, Capital Cove Real Estate, Capital
20  Cove Real Estate Advisors, Capital Cove Realty Group, Capital Cove REO
21  Opportunities Fund LLC, Capital Cove REO Opportunities Fund II, Capital Cove
22  REO Opportunities Fund III, Capital Cove REO Opportunities Fund IV, REO Multi
23  Asset Fund Holdings Inc., Capital Cove Investment Management, Inc., Capital Cove
24  Advisory, Capital Cove Financial Advisory Services LLC, Rittenhouse Square Trust
25  LLC, Rittenhouse Square Advisory LLC, Aspyration Capital Advisors Inc.,
26  Aspyration Financial Group, Inc., Nepenthe Capital Management Inc., Diversified
27  Realty and Financial Services Inc., Nepenthe Capital, First Asian Bancorp LLC; and
28  First Asian Management.

-3-                COMPLAINT FOR AVOIDANCE AND
                   RECOVERY OF FRAUDULENT TRANSFER

1    2.    The Receiver is authorized to pursue claims on behalf of Capital Cove

2  Bancorp LLC, and its affiliates and subsidiaries, pursuant to the order appointing

3  him as Permanent Receiver, Docket No. 97, Case No. 8:15-cv-00980-JLS-JC,

4  among other reasons.

5    3.    Capital Cove Bancorp LLC, and each of its subsidiaries and affiliates,

6  were operated through Capital Cove Bancorp LLC, with Khalfani managing each of

7  the Capital Cove subsidiaries and affiliates.

8    4.    Defendant Creative Asset Management, LLC ("CAM") is a California

9  limited liability company authorized to do business in the state of California.

10    5.    Defendant Hamilton Cove Realty, Inc. ("HCR") is a corporation

11  authorized to do business in the state of California.

12    6.    Defendant Dan W. Baer is an individual resident in the State of

13  California and he is the principal of Defendant CAM and Defendant HCR.

14    7.    Defendant Dennis Wesley is an individual and resides in Tehachapi,

15  California.

16    8.    Defendant Joanne Wesley is an individual and resides in Tehachapi,

17  California.

18    9.    Defendant Compass Alternative Investments, LLC ("Compass

19  Alternative Investments") is a limited liability company authorized to do business in

20  the state of California and has been named as a defendant herein as the initial

21  transferee of a deed of trust that was subsequently assigned to the other defendants

22  who Plaintiff is informed and believes were the intended beneficiaries.

23    10.    The knowledge of Baer as the agent of all the Defendants for the

24  purposes alleged in this Complaint is imputed to all of the Defendants.

25    11.    This Court has jurisdiction over this proceeding under 15 U.S.C.

26  § 77v(a), 15 U.S.C. § 78aa, and Cal. Civ. Code § 3439.04 because the proceeding is

27  ancillary to the case *Securities and Exchange Commission vs. Capital Cove Bancorp*

28  *LLC and Christopher M. Lee aka Rashid K. Khalfani*, presently pending before the

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

United States District Court as Case No. CV15-00980-JLS (JCx) (the "SEC Action").

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### The SEC Action

13.     Robert P. Mosier was appointed as the temporary Receiver of Capital Cove Bancorp LLC and its affiliates and subsidiaries (collectively, "Capital Cove") pursuant to this Court's June 18, 2015, Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Be Granted.

14.     The Receiver was appointed as the permanent receiver pursuant to the Order for Preliminary Injunction, Appointment of a Permanent Receiver, and Related Orders entered on September 1, 2015.

### The Ponzi Scheme

15.     Capital Cove purported to be a real estate and investment services firm focused on real estate-owned properties (*i.e.,* properties owned by a lender due to foreclosure) primarily located in Southern California, including Riverside, San Bernardino, Los Angeles, Orange, and Ventura counties.

16.     The firm's founder, owner, managing partner, chief compliance officer, and sole control person, Christopher M. Lee, has been convicted of multiple crimes and used an alias name, Rashid K. Khalfani ("Khalfani"), when operating Capital Cove. Using the alias Khalfani name, Khalfani solicited investors through its website, www.capitalcove.com, advertisements in local weekly newspapers, and investment conferences where the Capital Cove promotional material touting "investment opportunities" were heavily distributed.

17.     In particular, Capital Cove offered at least three "investment" programs: (1) a Trust Deed ("TD") program where investors' monies purportedly went directly to escrow for the purchase of distressed properties that were allegedly to be secured by a first TD; (2) an investment fund (the "Fund") program where

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

1   investors purchased purportedly a share of the investment fund that was also
2   allegedly secured by a first TD in favor of the fund, at least in some circumstances;
3   and (3) a joint venture (the "JV" program) where investors were purportedly going
4   to establish a JV corporate entity with a Capital Cove entity to buy and control "fix
5   and flip" properties. Some investors were promised junior lien positions, and others
6   were promised returns without a promise of a TD securing their position.

7       18.     To operate the Fund program, Khalfani formed two private investment
8   programs – the Rittenhouse Square Trust, LLC (the "Rittenhouse Fund") and the
9   Capital Cove REO Opportunities Fund II, LLC (the "REO Fund II") – as the sole
10  control person.  Since March 2012, these two programs alone raised about $1.9
11  million from at least fifteen investors.

12      19.     An accounting by the SEC calculated that between Rittenhouse Fund
13  and REO Fund II, the latter accounted for $1.4 million of the $1.9 million.  REO
14  Fund II required investors to open accounts at third-party custodians (*i.e.,* custodians
15  for self-directed IRAs), from which Capital Cove could invest the monies in "Class
16  A membership interests" in either Fund under the subscription agreements. Capital
17  Cove transferred investors' monies from the self-directed IRA account to bank
18  accounts purportedly in the name of the respective Fund.

19      20.     In a Form ADV filing with the SEC in December of 23, 2013, Capital
20  Cove recorded $62 million in assets under management. At one point, Capitol Cove
21  represented that the gross value of its real estate was approximately $17 million.
22  Capital Cove's "investment" business, however, was a complete sham. Capital Cove
23  used the Fund's monies to purchase property in its own name with all subsequent
24  "fix and flip" proceeds diverted elsewhere and not into the Fund's account. Only a
25  tiny fraction of the "investments" were secured by 1st and 2nd TDs. Instead,
26  investments generally were only secured with 2nd through 5th TDs, if any at all.

27      21.     In reality, Capital Cove's different "investment opportunities" were just
28  one large multi-million dollar Ponzi scheme orchestrated by Khalfani since the

-6-                COMPLAINT FOR AVOIDANCE AND
                   RECOVERY OF FRAUDULENT TRANSFER

"investment" firm started in early 2012.  Capital Cove promised investors that their investments were directly related to its "fix and flip" business and provided promissory notes reflecting returns of 12% to over 30% paid monthly or at the end of the "project" for the JV program.  These investors' funds were not used as represented, but instead: (a) fueled a Ponzi scheme; and (b) were diverted to Khalfani's personal benefit or paid to him in cash, either directly or indirectly through his countless "business" related entities.

22.     In marketing this Ponzi scheme, Capital Cove and Khalfani made several false misrepresentations, including boasting that the Fund was "vetted, qualified and registered" with the Securities and Exchange Commission and other regulatory agencies and was run by Khalfani as a qualified expert in the industry. Capital Cove and Khalfani enticed investors with additional marketing materials, private placement memorandums, and wiring instructions.  These contained numerous fraudulent and misleading statements.

23.     Capital Cove's enterprise consists of more than thirty entities. This is a common red flag of a questionable operation for such a small company.   Many of the companies do not have tax ID numbers and it appears no tax returns have ever been filed.   All office and field employees were treated as independent contractors and annually receive Form 1099s. This is contrary to IRS procedure that requires that individuals who work every day at the employer's site be treated as employees where withholding tax and social security payments are deducted from their gross pay.   There are seven lawsuits from past and current investors, most of which allege fraud and misrepresentation, which have been stayed due to the receivership.

24.     The investments that Capital Cove received were deposited and commingled in one primary bank account controlled by Khalfani and used for his other numerous "business related" entities.  Capital Cove's primary Chase bank account functioned as a commingled cash crock-pot from which interest and principal payments and minor business related expenses were funded with proceeds

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

obtained from new investors. Virtually all payments made to Capital Cove's investors were made with funds obtained from new investors and/or lenders.  Several examples provide illustrations:

- Investor One wired $175,000 into Capital Cove's primary Chase account in February 2015 increasing the balance to $190,063. None of the investor's monies was used to purchase an investment in the amount of $175,000 that was secured by a TD for the benefit of Investor One as promised to Investor One. Instead, Capital Cove subsequently made 69 expenditures or payments to other investors' interests over a three-day period, plus paid operating costs for Capital Cove's account. These expenditures totaled $157,011 and left a decreased account balance of $33,052;

- The same investor wired $100,000 into Capital Cove's primary Chase account in April 2015 increasing the balance to $113,777. Predictably, none of this investor's monies was used an investment in the amount of $100,000 that was secured by a TD for the benefit of Investor One as promised to Investor One. Instead, Capital Cove made 68 expenditures to pay bills or other investors' interest over a two-day period.  These expenditures totaled $103,225 and left an account balance of $10,552;

- Investor Two wired $92,000 into Capital Cove's primary Chase account in the same month increasing the balance to $99,819. Indeed, none of the investor's monies was used to purchase an investment in the amount of $92,000 that was secured by a TD for the benefit of Investor Two as promised to Investor Two.  Instead, Capital Cove made 42 expenditures to pay bills or other investors' interests over a two-day period. These expenditures

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

totaled $92,000 exactly and left an account balance of $7,819; and

- Investor Three wired $50,000 into Capital Cove's primary Chase account in May 2015 increasing the account balance to $76,398. None of this investor's monies was used to purchase an investment in the amount of $50,000 that was secured by a TD for the benefit of Investor Three. Instead, Capital Cove made 59 expenditures to pay bills and other investors' interest over a seven-day period. These expenditures totaled $75,901 and left an account balance of a meager $497.

25.    On June 18, 2015, the SEC brought an action to halt the ongoing fraud perpetuated by Capital Cove and Khalfani in the United States Central District Court of California, Case No. CV15-00980-JLS (JCx).

### Badges of Fraud Surrounded Capital Cove's Scheme

26.    The crux of Capital Cove's fraudulent scheme was purchasing properties, primarily in Southern California, using a combination of investor monies and funds from hard money lenders. These properties were either mostly or entirely encumbered by TDs from Capital Cove's investment programs and its agreements with hard money lenders. Each property had anywhere between two and five TDs attached to it leaving little to no equity left.

27.    The Defendants were on notice that Capital Cove made little to no profit in connection with the sale of the properties that were encumbered by liens in favor of the Defendants.

28.    The Defendants could have and should have known that Capital Cove could not turn a profit on the properties that it was purchasing when considering all of the liens placed against the properties, the cost of refurbishment, the carrying costs for the properties including insurance, taxes and interest, as well as the closing costs, commissions, late fees, and taxes to be paid upon the sale of the properties.

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

29.     Unsurprisingly, this unprofitable business "model" drove Capital Cove deep into insolvency.

30.     First, the "investment" firm withheld checks made to investors and lenders to avoid over-drafting its primary bank account. Between June 2014 and May 2014, Capital Cove's accounting records show that it prepared checks, that if released, would have caused an average monthly overdraft of $178,000 with the highest potential overdraft amount of $325,000. Only when monies from new investors arrived, or property sales closed, did Capital Cove release these checks.

31.     Second, interest payments were often sporadic, untimely, or inaccurate. The sporadic payments led to several frustrated investors threatening legal action and ultimately beginning legal actions against Capital Cove and Khalfani.

32.     Third, in an effort to hide its insolvency, Capital Cove created fictitious bank account statements that showed more money than what the firm actually had. A falsified May 2015 Morgan Stanley statement showed an account balance of $1,809,025.67, but in reality, the balance was a meager $58.62.

33.     Finally, Capital Cove made untimely loan payments to its hard money lenders, including its largest lender, the Center Street Lenders. With this lender, Capital Cove made at least 441 late payments on at least 63 different properties.

34.     Expectedly, Capital Cove often defaulted on its loan obligations and forced these lenders to foreclose on countless properties. By mid-June 2015, most of the Capital Cove 11 property loans with Center Street were in default.

35.     Khalfani was elusive and misleading in his dealings with frustrated and troubled investors. One particular investor, who chose Capital Cove's TD program, invested into four TDs but only received two. When this investor called Khalfani countless times, Khalfani failed to return a single phone call; the missing TDs never arrived.

36.     Capital Cove's failing "business model" was at odds with Khalfani's representation to investors that he was an experienced expert in real estate

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

investment.  On the contrary, Khalfani encountered legal troubles prior to and during Capital Cove's existence.

37.    Khalfani had at least two criminal convictions before Capital Cove. On or about November 19, 2000, Khalfani pleaded guilty to a misdemeanor for carrying a loaded firearm. Four years after, he pleaded guilty to five counts of felony grand theft and was sentenced to two years in prison and ordered to pay criminal restitution of $1,174,847.

38.    Alarmingly, he had one criminal conviction during Capital Cove's tenure. On or about November 13, 2013, Khalfani pleaded guilty to misdemeanor forgery and was sentenced to 180 days in jail and three years' probation, and ordered to pay fines and fees totaling $10,143.

39.    Legal woes were not limited to Khalfani. Both Capital Cove and Khalfani's related entities encountered legal trouble. Before Capital Cove's "fix and flip" business unraveled, it faced seven lawsuits from past and current investors alleging fraud and misrepresentation. In particular, one lawsuit by investor Martinez alleged a lost in investment of at least $4 million. This caused Capital Cove to spend at least $110,000 on legal bills since January 2015 alone.

40.    Relatedly, Aspyration Capital Advisors, Inc., formerly a California licensed real estate broker, surrendered its license in October 2013, following an investigation by the California Bureau of Real Estate. Since then, Aspyration Capital Advisors, Inc.'s corporate status has been suspended.

### *Liens on Existing Properties or Segregated Sales Proceeds*

41.    The following liens were granted to the Defendants indicated in the properties in paragraphs 42 to 45.  These properties are either still held in the receivership estate or have been sold free and clear of liens, with those liens remaining attached to the sales proceeds at this time.

42.    Capital Cove Asset Management Inc. transferred the following property interest to Defendant CAM in the property located at 3065 Rockford Ave.,

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

1   Highland CA 92346: Deed of Trust to Creative Asset Management LLC in the
2   amount of $140,000.00 (recorded June 12, 2015 in the official records of San
3   Bernardino County at document no. 2015-0244263).

4       43.     Capital Cove Asset Management Inc. transferred the following
5   property interest to Defendants Baer, Dennis Wesley and Joanne Wesley in the
6   property located at 5221 E. Fairlee Ct., Anaheim, CA 92807: Long Form Deed of
7   Trust and Assignment of Rents in the amount of $500,000.00 to Dan W. Baer
8   ($255,000.00) and Dennis Wesley and Joanne Wesley as Joint Tenants with Right
9   of Survivorship ($245,000.00) (recorded February 13, 2015 in the official records
10  of Orange County at document no. 2015000080168).

11      44.     Capital Cove Asset Management Inc. transferred the following
12  property interest to CAM in the property located at 5591 Rockledge Dr., Buena
13  Park, CA 90621: Deed of Trust in the amount of $500,000 to Creative Asset
14  Management LLC (recorded June 16, 2015 in the official records of Orange County
15  at document no. 2015000312335).

16      45.     Capital Cove Asset Management, Inc. transferred the following
17  property interest to Compass Alternative Investments, LLC in the property located
18  at 135 Spinks Canyon Rd. Duarte CA 91010: Deed of Trust to Compass Alternative
19  Investments LLC (recorded June 15, 2015 in the official records of Los Angeles
20  County at document no. 20150701735) (the "Spinks Initial Lien Transfer"), which
21  was subsequently assigned to Creative Asset Management (51%) and Dennis and
22  Joanne Wesley (49%) in the amount of $720,000.00, who Plaintiff is informed and
23  believes were intended to be the beneficiaries under this Deed of Trust.

24      46.     The granting of the liens in paragraphs 42 to 45 above as referred to as
25  the "Current Lien Transfers."

26      47.     The Defendants identified as the beneficiaries on the Deeds of Trusts
27  reflected in paragraphs 42 though 45 hereof are each initial transferees.

28

-12-    COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

48.    The Defendants who received an assignment of one or more of the Current Liens are subsequent transferees, including but not limited to Defendants CAM, Dennis Wesley and Joanne Wesley who received an assignment of the Spinks Initial Lien Transfer.

49.    With respect to the properties listed above, in addition the transfers of the Current Liens, there were transfers of cash from Capital Cove to one or more of the Defendants in an amount to be proven at trial to make interest payments and other payments on the open loans (the "Open Loan Cash Transfers").

50.    In addition, with respect to the Current Liens, there were transfers to HCR of at least $28,500 as commissions (the "HCR Open Loan Commission Transfers").

### *Liens on Previously Owned Properties*

51.    CAM was granted the following liens on a number of properties identified in the table attached as Exhibit A (the "Closed Lien Transfers").

52.    Capital Cove Asset Management Inc. transferred the following property interest to Defendant CAM in the property located at 4217 Ferguson Court, Riverside CA 92505: Short Form Deed of Trust to Creative Asset Management LLC in the amount of $165,000.00 (recorded August 19, 2014 in the official records of Riverside County at document no. 2014-0312996).

53.    Capital Cove Asset Management Inc. transferred the following property interest to Defendant CAM in the property located at 3111 Rodeo Road, Los Angeles CA: Deed of Trust to Creative Asset Management LLC in the amount of $275,000 (recorded September 10, 2014 in the official records of Los Angeles County at document no. 20140949023).

54.    Capital Cove Asset Management Inc. transferred the following property interest to Defendant CAM in the property located at 6888 Mendocino Place, Rancho Cucamonga, CA 91701: Short Form Deed of Trust to Creative Asset

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

1  Management LLC in the amount of $330,000.00 (recorded November 12, 2014 in
2  the official records of San Bernardino County at document no. 2014-0423992).

3      55.    Capital Cove Asset Management Inc. transferred the following property
4  interest to Defendant CAM in the property located at 2431 Seagull Ave. Ontario CA
5  91764: Short Form Deed of Trust to Creative Asset Management LLC in the amount
6  of $220,000 (recorded on November 25, 2014 in the official records of San
7  Bernardino County at document no. 2014-0452029).

8      56.    The payoff amounts that were paid to the CAM in connection with the
9  Closed Loans total at least $1,001,000.00 (the "Closed Loan Payoff Amounts") and
10 are also identified on Exhibit A hereto.

11     57.    Interest payments and other loan related payments in the amount of at
12 least $65,354.00 were also paid to CAM in connection with the Closed Loans (the
13 "Closed Loan Other Payments Made"). These transfers are also identified on the
14 attached Exhibit A.

15     58.    In addition, with respect to the Closed Loans, there were transfers to
16 HCR of at least $24,750 as commissions (the "HCR Closed Loan Commission
17 Transfers").

18     59.    The total amounts paid as cash transfers related to the Closed Loans
19 total $1,066,354.00 and are listed in column eight (8) of Exhibit A (the "Closed Loan
20 Cash Transfers").

21     60.    Payments constituting commissions, consulting fees or other types of
22 consideration were paid to HCR in connection with the Lien Transfers with the HCR
23 Open Loan Commissions and the HCR Closed Loan Commissions in an amount of at
24 least $63,350 and subject to proof at trial. The total HCR Open Loan Commissions
25 and the HCR Closed Loan Commission are referred to as the "HCR Cash Transfers".

26     61.    The Current Lien Transfers and the Closed Lien Transfers are
27 collectively referred to as the "Lien Transfers."

28

62.     The Open Loan Cash Transfers, the Closed Loan Cash Transfers, and the HCR Cash Transfers are collectively referred to as the "Cash Transfers."

### *Transfers Made in Furtherance of Ponzi Scheme*

63.     Capital Cove could not have run its Ponzi scheme but for the ability that the Defendants gave Capital Cove to purchase some real properties to deceive the investors.

64.     Capital Cove's scheme was dependent on creating the appearance that it was a real estate and investment firm. Capital Cove induced the victims of its fraud to invest money based on the belief that their money would be used to purchase and refurbish distressed properties and the promise that their investment would be secured by first TDs. Rather than being used for new investments in real estate, investor money often was being used to pay Capital Cove's operating expenses, make payments to existing investors, and for Khalfani's personal use. Instead of receiving first TDs as promised, investors received junior liens or no liens at all.

65.     In order to maintain this scheme and create the appearance of legitimacy, Capital Cove did in fact purchase and sell some properties by using funds obtained from the loans made by the Defendants. The money that Defendants gave to Capital Cove was used to keep the Ponzi scheme going.

66.     The Defendants would not lend money to Capital Cove unless they were given a senior deed of trust against the properties that were being purchased in Capital Cove's name.  The purchase of the properties was a necessary part of the scheme, which was enabled by the granting of the liens to Defendants.  Similarly, the Cash Transfers were made to maintain the lending relationship between Capital Cove and the Defendants, giving Khalfani ready access to funds enabling Capital Cove to remain in operation and the fraud to continue.  Had the Lien Transfers and Cash Transfers not been made, Khalfani and Capital Cove would not have been able to continue to perpetuate the fraudulent scheme.

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

*The Lien Transfers and Cash Transfers Were Transfers of Interests in Property*
*that Harmed the Creditors*

67.    At the time the Lien Transfers and Cash Transfers were made, Khalfani and Capital Cove understood that causing those transfers to be made would inevitably harm Capital Cove's investors.  Khalfani knew that he was operating a Ponzi scheme, that he was defrauding investors into providing financing that was being misappropriated rather than being used to purchase and refurbish new real property, and that Capital Cove investors could not be paid when the scheme collapsed.

68.    Khalfani and Capital Cove knew that by causing the Lien Transfers, Capital Cove investors would not receive first TDs as promised and what junior TDs Capital Cove investors did receive, if any, had little or no value.  The Lien Transfers put beyond reach of the investor creditors' proceeds from the sale of the property that otherwise would have been available to pay debts owed to creditors. One example of the actual harm to creditors was the claim of creditor Edward Solution Inc., who held a claim and was promised first position TDs in exchange for his investment of $500,000. Edward Solution Inc. wired $500,000 directly to Reliable Escrow on June 12, 2015, to be used for the purchase of property, including the purchase of the property located at 135 Spinks Canyon Rd. Duarte CA 91010. Instead, Capital Cove made the Spinks Initial Transfer in favor of Compass Alternative Investments, and of the $500,000 investment of Edward Solution, at least $300,000 was wired to Capital Cove's operating account and was not used to purchase property, and Edward Solution was not granted the lien that it was promised.

69.    The granting of the Lien Transfers placed the equity in the properties owned by Capital Cove out of the reach of the unsecured creditors and, in many circumstances, out of the reach of investors who had been promised the senior lien position in those very properties.

COMPLAINT FOR AVOIDANCE AND
                                        RECOVERY OF FRAUDULENT TRANSFER

70.     The creditors thus suffered a palpable economic harm from the fraudulent Lien Transfers.

71.     The Cash Transfers also removed money from Capital Cove that otherwise would have been available to pay debts to creditors, placing that cash that would have otherwise been available to pay the debts to creditors out of the reach of those creditors.

72.     The inevitable result of the Lien Transfers was that investor creditors would be harmed and prejudiced by the Defendants obtaining a senior secure position.  Khalfani and Capital Cove also knew that causing the Cash Transfers would harm Capital Cove investors by reducing the amount of funds available to repay creditors.

73.     If not for the Lien Transfers and the Cash Transfers, there would have been sufficient unencumbered equity in the properties to leave some cash proceeds from the sale of the properties available to pay creditors.

74.     Finally, Khalfani knew that causing the Lien Transfers and Cash Transfers would harm Capital Cove investors by prolonging the scheme.  Khalfani intended to hinder, delay, and defraud the investor creditors by granting the first trust deed security to Defendants and consequentially interfering with investor's ability to get paid.

### ***Defendants' Knowledge of the Poor Financial Condition of Capital Cove and Suspicious Circumstances Surrounding the Loans***

75.     Dan Baer has been a sophisticated business person and real estate investor since at least 1985.

76.     Dan Baer and Capital Cove's relationship goes back to at least 2012. For example, Baer was invited to Capital Cove's 2012 Holiday Party and was provided with documentation of Capital Cove's "preliminary fund" documents in November of 2012.

77.     In May of 2013, Baer followed up with Khalfani regarding requests for information about: (a) proposed investments; (b) documentation regarding setting up his own investment fund; and (c) finding a prospective home for Baer's daughter.

78.     On July 10, 2014, Khalfani sent solicitation materials about Capital Cove to Baer that contained numerous false representations, such as how investors could expect unrealistic investment returns (for example, the materials touted "verified double-digit annualized returns") that went along with some investment structures that were described as "Conservative to Moderate."

79.     Some of the checks paid by Capital Cove to CAM reflected in the memo line that they were a "Monthly Distribution" rather than interest payments.

80.     In addition to the business relationship between Capital Cove and CAM, there was a personal relationship between Khalfani and Baer. For example, Khalfani invited Baer and his wife to a small birthday party at Khalfani's home in October of 2014.

81.     Khalfani also did a personal favor for Baer's son by "push[ing] through his Priority Referral Partner registration" as a "silent" referral without Baer's son needing to "undergo the normal functions" required for such registration.

82.     The extent to which the relationship between Capital Cove and CAM went beyond a simple lender/borrower relationship is further illustrated by an e-mail to a real estate broker sent on August 27, 2014, in which Khalfani represented that "Mr. Dan Baer works with me and is a member of our IAC board" when trying to explain Capital Cove's "changing the terms at the 11th hour" with respect to closing an escrow.  Baer received a copy of this email and did not object or otherwise indicate disagreement with the statement that he was a member of Capital Cove's IAC board.

83.     With respect to that August 2014 closing, Baer was copied on e-mails from the escrow officer who was rejecting Khalfani's attempts to give verbal information only in order have a note and deed of trust prepared. Such a request to

                                    COMPLAINT FOR AVOIDANCE AND
                                    RECOVERY OF FRAUDULENT TRANSFER

1  the escrow officer to accept only verbal changes to escrow should have raised

2  another red flag to Baer and CAM.

3        84.     Through Bear's company, Hamilton Cove Realty, Inc. ("HCR"), Baer

4  acted as the broker for the CAM loans and received substantial commissions that

5  were reflected as disbursements for loan origination fees.  For example, Baer and his

6  company received $20,500 on or about April 28, 2015 for the sale of the property at

7  28642 Point Loma, Laguna Nigel, CA, 92677 (the "28642 Point Loma sale").  This

8  was the second half of the payment on what was a $41,000 commission for this

9  property alone.  Moreover, with respect to this transaction, the note and deed of trust

10  were executed in favor of Dan Baer's client, Mark McCormick, who is the managing

11  member of Defendant Compass Alternative Investments. Khalfani also signed a

12  personal guaranty on this loan – contrary to assertions that Baer has made that he

13  "only looks to the property" to secure the hard money loans.

14        85.     Baer also arranged for other family members to receive payments in

15  connection with the transactions done with Capital Cove. For example, James K.

16  Baer dba Comply Tek was to be paid as a "consultant" in transactions, including but

17  not limited to the payment of $4,125.00 in connection with the loan on the property

18  located at 4217 Ferguson Court, Riverside CA 92505.

19        86.     At the time the majority, if not all, of the loans were made, Defendants

20  were aware of Capital Cove's poor financial condition.

21        87.     A review of the title reports or closing statements at the time that

22  CAM's loans were paid off would have revealed, and actually did reveal, junior

23  liens on the properties on which Defendants had obtained a senior lien.

24        88.     In January of 2015, problems with the loan transactions were apparent.

25  CAM and Baer were told by Capital Cove and Khalfani that an offer was accepted on

26  a purchase contract on property at 520 North Valley Center that CAM had agreed to

27  fund.  CAM wired $500,000 into escrow after Khalfani told him the transaction was

28  about to close.  However, on January 15, 2015, Khalfani abruptly informed CAM

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

1    and Baer that deal was off the table and the transaction would not be closing.  Baer

2    complained to Khalfani in an e-mail the same day that the news was "[n]ot what I

3    expected to hear.  A lot of time and effort has gone towards qualifying for the Valley

4    Center Investment.  You said you were ready to close, and requested the funds be

5    wired into escrow.  Based on your representations we wired the funds."

6          89.    In or about February 2015, CAM agreed to make four loans to Capital

7    Cove but of only one loan closed as scheduled.  The three remaining loans were

8    delayed until June 2015 because, as was known to CAM, Capital Cove could not

9    raise sufficient capital to acquire new properties.

10         90.    In addition to the three loans whose closings were delayed until June

11   2015, throughout April and May of 2015, Baer, the principal of CAM, was working

12   with Capital Cove on another loan through HCR. In addition to being the managing

13   member of CAM, Baer is the president of HCR.  Similar to the CAM loans, the

14   proposed HCR loan was fraught with delays and ultimately did not close.  Through

15   Baer, CAM is charged with the knowledge of Capital Cove's inability to close on

16   this transaction due to Capital Cove's poor financial condition.

17         91.    Throughout the month of May 2015, there was substantial

18   correspondence between Baer and Capital Cove about delays and Khalfani's inability

19   to close the 28642 Point Loma sale. Thus, in addition to the delays on the three sales

20   that actually did close in June 2015, the 28642 Point Loma transaction was ongoing

21   in May, and Baer was on notice that Khalfani could not come up with the money to

22   close the 28642 Point Loma sale as well.

23         92.    Prior to the closing of the three remaining loans in June 2015, CAM

24   admitted it was aware that Capital Cove was suffering cash flow problems and that

25   Capital Cove was seeking to conceal those problems.

26         93.    In particular, on June 11, 2015, CAM e-mailed Khalfani requesting to

27   meet and wrote: "You have not signed the loan documents, an additional

28   $146,503.53 is required to close escrow, the deadline to close is tomorrow, June 12,

                              -20-      COMPLAINT FOR AVOIDANCE AND
                                        RECOVERY OF FRAUDULENT TRANSFER

2015, the Seller and Seller's agent are very worried and deeply concerned, and no one has heard from you.  I realize that you are having cash flow problems, but you can't treat people like **'mushrooms' (i.e., keeping them in the dark and feeding them a load of manure)**.  I want to work with you R.K. but you have got to help me to help you." (emphasis added).

94.    Despite this actual knowledge of cash flow problems, delays in closing loan transactions, and a sense of being "kept in the dark," CAM closed on the three additional Capital Cove loans.

95.    At the times the loans were made, CAM possessed enough actual knowledge, and was aware of more than enough red flags and suspicious circumstances, to induce a reasonable person to inquire further into the transaction.

96.    Indeed, even after the SEC filed its complaint against Capital Cove and Khalfani outlining Khalfani's prior criminal convictions, his numerous fraudulent representations to investors, and the millions of dollars lost by innocent investors, Baer continued his friendly relationship with Khalfani.  Baer even stated expressly in an e-mail on July 28, 2015 to Khalfani that, "I certainly do not want to be called upon as a witness to testify to anything that could prove negative to you."

97.    On August 27, 2015, Khalfani sent Baer an e-mail updating Baer on Khalfani's new company and contact information, noting that he hoped to see Baer soon.

## FIRST CLAIM FOR RELIEF

**(For Avoidance and Recovery of Fraudulent Transfers – Lien Transfers)**

**(Cal. Civ. Code §§  3439.04(a)(1), 3439.07(a)(1)  and 3439.08(b)(1))**

**(Against Initial Transferees)**

98.    Plaintiff repeats and re-alleges all of the allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim.

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

99.    The Lien Transfers of both the Current Liens and the Past Liens constituted one or more transfers of interest in property of Capital Cove as defined under section 3439.01 of the California Civil Code.

100.    The Defendants received these transfers and were, therefore, the initial transferees of such transfers and/or parties for whose benefit the transfer were made.

101.    The knowledge of Baer as the agent of all the Defendants for the purposes alleged in this Complaint is imputed to all of the Defendants.

102.    Each of the Lien Transfers was part of the fraud of Capital Cove. Capital Cove and Khalfani made the transfers to Defendants in furtherance of a Ponzi scheme.

103.    Each of the Lien Transfers was made by Capital Cove with the actual intent to hinder, delay, or defraud one or more of its creditors.

104.    There are at least 69 investors who have been harmed by the Lien Transfers and who held, or still hold, matured or unmatured claims against Capital Cove.

105.    The Receiver is entitled to avoid the Lien Transfers pursuant to California Civil Code section 3439.04(a)(1) and 3439.07(a)(1).

106.    Furthermore, under California Civil Code section 3439.08(b), the Receiver is entitled to recover from Defendants CAM, Dennis Wesley, Joanne Wesley and Compass Alternative Investment the property transferred to them, or the value of the Lien Transfers, plus interest thereon as allowed by law.

## SECOND CLAIM FOR RELIEF

**(For Avoidance and Recovery of Fraudulent Transfers – Lien Transfers)**

**(Cal. Civ. Code §§ 3439.04(a)(1),  3439.07(a)(1),   and 3439.08(b)(2))**

**(Against Subsequent Transferees)**

107.    Plaintiff repeats and re-alleges all of the allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim.

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

108.   The Lien Transfers of both the Current Liens and the Past Liens constituted one or more transfers of interest in property of Capital Cove as defined under section 3439.01 of the California Civil Code.

109.   The Defendants that received assignments of the Current and Past Liens were the subsequent transferees of such transfers.

110.   CAM, Dennis Wesley and Joanne Wesley received the subsequent transfer of the Spinks Initial Lien Transfer identified in above paragraph 44 as subsequent transferees.

111.   The Spinks Initial Lien Transfer was made as part of the fraud of Capital Cove. Capital Cove and Khalfani made the Spinks Initial Lien Transfer in furtherance of a Ponzi scheme.

112.   The Spinks Initial Lien Transfer was made by Capital Cove with the actual intent to hinder, delay, or defraud one or more of its creditors.

113.   There are at least 69 investors who have been harmed by the Spinks Initial Lien Transfer, including but not limited to Edward Solution Inc., and who held, or still hold, matured or unmatured claims against Capital Cove.

114.   The Receiver is entitled to avoid the assignment of the Spinks Initial Lien Transfer made to Defendants CAM, Dennis Wesley and Joanne Wesley set forth in paragraph 44,  pursuant to California Civil Code sections 3439.04(a)(1) and 3439.07(a)(1).

115.   Furthermore, under California Civil Code section 3439.08(b)(2), the Receiver is entitled to recover from Defendants CAM, Dennis Wesley and Joanne Wesley either the property transferred, or the value of the Spinks Initial Lien Transfer, plus interest thereon as allowed by law.

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

## THIRD CLAIM FOR RELIEF

**(For Avoidance and Recovery of Fraudulent Transfers)**
**(Cal. Civ. Code §§ 3439.04(a)(2), 3430.05, 3439.07(a)(1)  and 3439.08(b)(1))**
**(Against Defendant Compass Alternative Investments)**

116.   Plaintiff repeats and re-alleges all of the allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim.

117.   The Spinks Initial Lien Transfer constituted a transfer of an interest in property of Capital Cove as defined under section 3439.01 of the California Civil Code.

118.   Defendant Compass Alternative Investments did not pay any consideration in exchange for the Spinks Initial Lien Transfer.

119.   Capital Cove did not receive reasonably equivalent value from Defendant Compass Alternative Investments in exchange for the Spinks Initial Lien Transfer.

120.   At the time that the Spinks Initial Lien Transfer was made, Capital Cove was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

121.   At the time that the Spinks Initial Lien Transfer was made, Capital Cove intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as the debts became due.

122.   Capital Cove was insolvent or became insolvent as a result of the Spinks Initial Lien Transfer.

123.   The Receiver is therefore entitled to avoid the Spinks Initial Lien Transfer as a constructively fraudulent transfer pursuant to California Civil Code sections 3439.04(a)(2) and 3439.07(a)(1).

124.   Furthermore, under California Civil Code section 3439.08(b)(1), the Receiver is entitled to recover from Defendant Compass Alternative Investments

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

either the property transferred, or the value of the Spinks Initial Lien Transfer, plus interest thereon as allowed by law.

### FOURTH CLAIM FOR RELIEF

**(For Avoidance and Recovery of Fraudulent Transfers – Cash Transfers)** (**Cal. Civ. Code §§ 3439.04(a)(1), 3439.07(a)(1) and 3439.08(b))**

125.   Plaintiff repeats and re-alleges all of the allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim.

126.   The Plaintiff is entitled to avoid the Lien Transfers, which Lien Transfers resulted in the Cash Transfers.

127.   The Cash Transfers constituted one or more transfers of interest in property of Capital Cove as defined under section 3439.01 of the California Civil Code.

128.   The Defendants received the Cash Transfers and were, therefore, the initial transferees of such transfers and/or parties for whose benefit the transfer were made.

129.   The Cash Transfers were made as part of the fraud of Capital Cove. Capital Cove and Khalfani made the transfers to Defendant in furtherance of a Ponzi scheme. The Cash Transfers were made by Capital Cove with the actual intent to hinder, delay, or defraud one or more of its creditors.

130.   There are at least 69 investors who have been harmed by the Cash Transfers who held, or still hold, matured or unmatured claims against Capital Cove..

131.   The Receiver is entitled to avoid the Cash Transfers pursuant to California Civil Code sections 3439.04(a)(1) and 3439.07(a)(1).

132.   Furthermore, under California Civil Code section 3439.08(b), the Receiver is entitled to recover from the Defendants the property transferred to them, or the value of the Cash Transfers, plus interest thereon as allowed by law.

COMPLAINT FOR AVOIDANCE AND
RECOVERY OF FRAUDULENT TRANSFER

## **PRAYER FOR RELIEF**

WHEREFORE, Receiver respectfully requests that this Court enter judgment in favor of the Receiver and against the Defendants as follows:

1.     Entering an order of judgment avoiding and recovering the Lien Transfers to Defendants under Cal. Civ. Code §§ 3439.04(a)(1), 3439.07(a)(1), and 3439.08(b)(1);

2.     Entering an order of judgment avoiding and recovering the Lien Transfers, including the assignment of the Spinks Initial Lien Transfer, to Defendants as subsequent transferees under Cal. Civ. Code §§ 3439.04(a)(1),  3439.07(a)(1), and 3439.08(b)(2);

3.     Entering an order of judgment avoiding and recovering the Spinks Lien Transfer to Defendant Compass Alternative Investment  under Cal. Civ. Code §§ 3439.04(a)(2), 3439.07(a)(1), and 3439.08(b)(1);

4.     Entering an order of judgment avoiding the Cash Transfers to Defendants under Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07(a)(1);

5.     Recovering the value of the Cash Transfers under Cal Civ. Code § 3439.8(b);

6.     Entering an order of judgment in an amount to be proven at trial in favor of the Receiver and against the Defendants;

7.     Prejudgment and post-judgment interest as allowed by law; and

8.     For all other and further relief as the Court deems just and proper.

Dated:  November 10, 2015          DIAMOND McCARTHY LLP


                                   By:     */s/ Kathy Bazoian Phelps*
                                           Kathy Bazoian Phelps
                                           Christopher D. Sullivan
                                           Attorneys for Robert P. Mosier,
                                           Permanent Receiver

COMPLAINT FOR AVOIDANCE AND
                                                        RECOVERY OF FRAUDULENT TRANSFER